**CROWN COAT FRONT CO., Inc.**

v.

**UNITED STATES.**

No. 222–58.

United States Court of Claims.

July 19, 1961.

Rehearing Denied Nov. 1, 1961.

Edwin J. McDermott, Philadelphia, Pa., for plaintiff.

Philip W. Lowry, Washington, D. C., with whom was Asst. Atty. Gen., William H. Orrick, Jr., for defendant. Edwin J. Reis was on the brief.

DURFEE, Judge.

Plaintiff filed a petition in this court on May 17, 1958, claiming breach of contract by defendant. Defendant awarded Contract No. QM–7726 OI–2391–E–56 to plaintiff on April 26, 1956, for the manufacture of 350,000 canteen covers lined with felt. The canteen covers were to be made pursuant to certain specifications, which included a specific requirement that the felt used in making the product meet certain tests with respect to mildew resistance, and a requirement that the felt contain one of two specified chemicals, in specified amounts, as mildew resistant treatment. The issues of liability and damages have been separated, and by agreement of all concerned, the trial in the first instance was limited to the issues of law and fact relating to the right of the plaintiff to recover.

Plaintiff actually bid for the manufacture of 760,000 dismounted canteen covers. Bids were opened February 21, 1956, and on February 24 the contracting officer requested a preaward plant survey in connection with plaintiff's bid to deliver 760,000 canteen covers, scheduled monthly for the period of June to October, 1956. Apparently based upon information developed during such survey, the plaintiff was only awarded a contract to manufacture 350,000 canteen covers, with deliveries to be made in specified quantities monthly between July 25 and November 24, 1956. Plaintiff protested the reduction in volume made by defendant. Both the invitation and the award provided that defendant reserved the right to make an award for a quantity less than the amount bid upon at the unit price offered. Plaintiff agreed to accept an award for 350,000 units.

On May 28, 1956, plaintiff entered into a sub-contract with Crown Canvas Products, Inc., whereby the latter corporation agreed to finance and manufacture the 350,000 canteen covers under prime contract QM–7726 OI–2391–E–56.

Plaintiff withdrew its protest concerning the reduction in the number of canteen covers involved in the original invitation and bid after plaintiff had negotiated a separate contract with defendant numbered QM–7796 OI–2567–E–56 for an additional 89,000 canteen covers dismounted.

The award to plaintiff provided that preproduction samples would be required. The samples, including such component parts as felt, thread, snaps, and hardware, were required for specification tests to be conducted by defendant. No similar tests were made by plaintiff.

Plaintiff was late in delivering under the contract schedule. After two contract modifications, extending the times for plaintiff's performance, and a partial

termination of the contract on May 7, 1957, which reduced the total number of covers due under the contract from 350,000 to 284,500, plaintiff actually delivered 251,600 canteen covers under Contract QM–7726 before the contract was terminated by defendant for default on June 5, 1957. The contract provided that if the termination was for default, and plaintiff's failure to make deliveries was due to causes which were excusable under the contract terms, the termination would be deemed to have been accomplished for the convenience of the Government. The record in this case does not establish that plaintiff's delays in furnishing the required type of felt and failure to complete deliveries called for by the contract fall within a category which would warrant a finding that they were or can be classified as excusable.

Plaintiff's position is that defendant breached the contract by improperly rejecting certain lots of felt delivered by plaintiff, so that plaintiff's costs of production were increased and it was delayed so that it was unable to produce the total quantity of covers called for in the contract. Plaintiff says that the rejections were unjustified because they were the result of defendant's subjecting the felt to certain tests which had not been specified in the contract. Plaintiff has failed to prove that there was a breach of the contract by defendant. Under a proper interpretation of the contract terms, the defendant could reject felt offered by plaintiff for use in making the canteen covers if such felt did not meet the specifications for mildew-inhibitor content or was otherwise shown to be unacceptable by reasonable and necessary tests. The tests for content and percentage concentration of mildew inhibitor were both reasonable and necessary and were accomplished in such a manner as not to unduly delay the work. Plaintiff's contention is that, since only one method of testing the felt is spelled out in the specifications for testing one element of the product (mildew resistance) the defendant is precluded from testing the product for another specified element (mildew-inhibitor content). The court does not accept this view. Plaintiff offered no evidence which shows or tends to establish that any one of the various lots of felt rejected by defendant, in fact contained the specified mildew-inhibitor content. No tests of the type generally recognized as proper and necessary in such instances were made by plaintiff or its supplier. Plaintiff's expert witness on this subject testified that the tests made by defendant were standard procedure and were tests generally accepted and were "common practice in any laboratory." Plaintiff has not challenged the accuracy of such tests, the manner in which they were performed, or the results obtained. The fact that the contract specified a test for mildew-resistance in no way precluded defendant from making whatever tests were necessary for determining whether the felt complied with another element of the contract specifications, a prescribed mildew-inhibitor content. It would be meaningless for the contract to provide a specific chemical content for the felt, while at the same time precluding the making of such tests as were necessary to determine if that content were actually present.

Plaintiff did not raise the objection that the tests were not specified and therefore unauthorized by the contract during the period of the contract. When notified that certain lots of the felt in question were unacceptable, plaintiff initiated negotiations for a reduction of its contract price, without questioning defendant's right to reject. By this conduct, plaintiff accepted the defendant's interpretation of the contract and specifications as to tests of the felt being furnished.

In Central Engraving Company v. United States, 59 F.Supp. 553, 565, 103 Ct.Cl. 440, 465, this court said:

"The contracting officer and the head of the department agreed with plaintiff's interpretation of the intent and meaning of the specifications and drawings, and any ambiguity which might otherwise appear

on the face of the documents is therefore now of no moment. The interpretation of a contract by the parties to it before it becomes the subject of controversy is deemed by [them] to be of great, if not controlling, weight."

Plaintiff contends that defendant was responsible for the delays and defaults in the delivery of canteen covers, by reason of having unduly delayed the issuance of laboratory reports on the tests of felt samples. We think that the record establishes that plaintiff was responsible for most of the delay incident to the performance of the contract simply because plaintiff repeatedly accepted felt from its supplier, Western Felt Works, which failed to meet the requirements of the contract and specifications. Following each of several rejections by defendant, the supplier continued to assure plaintiff that its next shipment of felt would measure up to the Government's requirements. The goal was never realized. Plaintiff ultimately ceased to make protests to its supplier with respect to the quality of the felt being supplied and never made a change in its source of felt. It could have obtained felt from another supplier at considerably less cost, but did not elect to do so.

The fact is that from a total of 12 samples from numbered lots submitted to defendant during the period from June 18 to December 31, 1956, only two (lots 3 and 6) met the minimum requirements of 1 percent of 2.2 dihydroxy-5.5 dichlorodiphenyl methane or $\frac{1}{2}$ percent of salicylanilide (finding 19).

Each time plaintiff was notified of the rejection of felt submitted to defendant, plaintiff would discontinue manufacturing canteen covers by use of such felt until it was notified that the felt would be accepted at a reduced price. After agreement of the parties as to the reduced price, plaintiff would resume work under the contract. Plaintiff made its final delivery on May 14, 1957, having delivered a total of 251,600 canteen covers up to that time. Plaintiff was unable to complete the contract. On June 5, 1957, the contract was terminated for default.

Plaintiff appealed from the decision of the contracting officer terminating the contract for default, and contended before the Armed Services Board of Contract Appeals that plaintiff's delay was excusable on the grounds that the felt submitted met the contract specifications and that defendant took an unreasonably long time in accepting (at a lower price) the felt that did not conform to requirements of the Government. The Board denied the appeal and found that (1) the contract was terminated for default, (2) the failure to perform the contract was not beyond the control or without fault or negligence on the part of plaintiff, and (3) plaintiff's failure to perform the contract in the time originally allowed, plus an extension of five months allowed by defendant, "was directly attributable to appellant's continued submission of nonspecification material" (finding 61). That determination by the Armed Services Board of Contract Appeals was not arbitrary or capricious and is supported by substantial evidence.

Counsel for defendant has set forth other bases for possible denial of plaintiff's right to recover. It is not deemed necessary to enter into a detailed discussion of these matters in view of our conclusion that plaintiff is not entitled to recover.

Defendant has also asserted two counterclaims. However, as has been stated above, the parties have agreed that the trial of the case in the first instance be limited to the issues of law and fact with respect to plaintiff's right to recover. Having determined that plaintiff is not entitled to recover, we return the case to the trial commissioner for further proceedings with respect to the defendant's right to recover on its counterclaims.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and WHITAKER, Judges, concur.